UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAYMOND MANCUSO                          :
     Plaintiff,                          :
                                         :
v.                                       :          CIVIL ACTION NO.
                                         :          3:08-cv-1018 (VLB)
DARLENE DUNBAR,                          :
KRISTINE RAGAGLIA, AND                   :
FREDERICK HEISLER,                       :
     Defendants.                         :          February 5, 2010

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [Doc. #34]

The Plaintiff, Raymond Mancuso, brings this action for declaratory relief and damages against the Defendants, Darlene Dunbar, Kristine Ragaglia, and Frederick Heisler.  The Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights to due process and equal protection.  Currently pending before the Court is the Defendants' motion for judgment on the pleadings.  See Doc. #34.  For the reasons that follow, the Defendants' motion is GRANTED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff's Complaint alleges the following facts.  The Plaintiff was employed as a social worker at the Department of Children and Families ("DCF") and its predecessor from 1977 until July 10, 2006.  Pursuant to Conn. Gen. Stat. § 5-240(c), the Plaintiff was a classified state employee who could be discharged only for good cause and possessed a right to multi-stage administrative review if discharged.

Sometime around 1984-1985, the Plaintiff was assigned as a social worker to conduct an investigation of the parental fitness of the mother of a young boy. The woman is referred to in the Complaint as "Jane Doe."  The Plaintiff went to Doe's home and found no cause to believe that she was neglecting her child.  The Plaintiff considered the matter closed.  Doe never received DCF services as a result of the Plaintiff's assignment.

The Plaintiff and Doe both lived in Enfield, Connecticut.  Several months after stopping at her home, the Plaintiff ran into Doe in Enfield.  They talked and gradually became friends.  One day they had a sexual encounter.  They remained friends afterwards.  At some point, a local social work volunteer questioned whether the friendship between the Plaintiff and Doe was appropriate.  As a result, DCF investigated the issue.

The Plaintiff's supervisor at the time, Tom Gilman, questioned the Plaintiff and spoke with Doe twice.  Gilman reminded the Plaintiff to ensure that he had been complying with DCF rules forbidding sexual relationships with DCF "clients."  Doe twice told Gilman that the Plaintiff had done nothing improper. The Plaintiff affirmed that his behavior accorded with the applicable professional rules.  Gilman convened a meeting to consider the issue with all interested parties, including a DCF personnel official and the Plaintiff's union representative.  Following the meeting, Gilman wrote a letter to the Plaintiff in which he advised the Plaintiff "that my inquiry is finished resulting in your complete exoneration."  Compl. ¶ 20.

2

Unbeknownst to the Plaintiff, in 1997 DCF conducted a second investigation of the Plaintiff's relationship with Doe in 1984-1985.  A report was prepared following the 1997 investigation which documented allegations made by Doe against the Plaintiff.  The report indicates that, 10 years after the Plaintiff last saw Doe, she had become ill and was a patient in a psychiatric hospital.  A DCF psychiatric social worker described Doe as paranoid and "actively psychotic." Doe claimed, among other things, that the Plaintiff had coerced her into sex, planted video cameras in her home in order to watch her at all times, threatened to use his powerful uncle/father the Mayor of Enfield to take away her child if she did not cooperate, and secretly erased her records from DCF computers.

The Commissioner of DCF at the time, Kristine Ragaglia, reviewed the report and determined that the Plaintiff had an "improper relationship" with Doe in 1984-1985.  She never questioned the Plaintiff about Doe's allegations. Following the investigation, Ragaglia decided to punish the Plaintiff by preventing him from "significantly advancing within the organization."  Although he did not know the reason for it at the time, the Plaintiff alleges that, in 1997, he was denied a promotion to a position of higher pay and responsibility, banished from the "inner circle" of DCF leadership, and stripped of his support staff and office space.

3

On August 26, 2005, the Plaintiff became acting DCF court monitor following the resignation of previous court monitor Ray Sirry.[1]  Shortly before the Plaintiff's appointment, Attorney General Richard Blumenthal received an anonymous complaint against the Plaintiff and DCF under Connecticut's "whistleblower" statute, Conn. Gen. Stat. § 4-61dd.  The complaint suggested that, over 20 years ago, the Plaintiff had an inappropriate sexual relationship with a DCF client and that DCF had been covering it up.  Attorney General Blumenthal informed DCF Commissioner Darlene Dunbar of the complaint.  Dunbar did not inform the Plaintiff of the complaint.  Later, he accepted the post as acting court monitor.

On October 12, 2005, the Plaintiff was appointed as permanent DCF court monitor.  Again, Dunbar failed to inform the Plaintiff of the whistleblower complaint before he accepted the post.  Instead, Dunbar hired a retired state employee, Dawn Close Harris, to investigate the complaint.  Shortly thereafter, in December 2005, Mancuso learned of the complaint when an article appeared on the front-page of the Hartford Courant documenting the findings from the 1997 investigation.  This marked the first time that the Plaintiff heard of the 1997 investigation.

The third DCF investigation of the Plaintiff lasted several months.  By letter to DCF's counsel dated April 24, 2006, the Plaintiff complained that the reopening

---

[1]  The Complaint indicates that, for the past 18 years, DCF has operated under a consent decree providing for a court-appointed monitor to oversee DCF's work and ensure compliance with enumerated performance standards.

of the matter and the manner in which it was being investigated violated his right to due process concerning his property interest in his job.  His protestations were unavailing.  On June 2, 2006, Harris delivered her 142-page report to Commissioner Dunbar.  That same afternoon, Dunbar's human resources director informed Mancuso that he was required to attend a <u>Loudermill</u> disciplinary hearing[2] four days later, on June 6, 2006, to answer misconduct charges as a result of his "inappropriate relationship with a DCF client."

Commissioner Dunbar presided over the Plaintiff's <u>Loudermill</u> hearing. The Plaintiff's attorney reiterated the due process concerns raised in his April 24, 2006 letter.  Dunbar rejected these concerns without offering an explanation for doing so.  The Plaintiff's attorney also argued that the Plaintiff's friendship with Doe violated no DCF rule or code of conduct.  DCF's 1986 Policy Manual, Volume 6, Chap. III, Bulletin 5, prohibited social workers from having sexual relationships with DCF clients, but did not prohibit sexual relationships with former DCF clients or individuals who were briefly considered for DCF services.  Nevertheless, on June 26, 2006, Dunbar dismissed the Plaintiff from his DCF position effective July 10, 2006.  Dunbar stated that she was terminating the Plaintiff because he had "admitted to cultivating a personal relationship and engaging in a sexual encounter with a former DCF client."  Compl. ¶ 35.  Dunbar did not indicate that

---

[2] **Pursuant to the Supreme Court's ruling in <u>Cleveland Board of Educ. v. Loudermill</u>, 470 U.S. 532 (1985), classified state employees who by statute may be discharged only for cause, such as the Plaintiff, are entitled to a pre-termination hearing as a matter of due process.**

she was terminating the Plaintiff for any of Doe's 1997 allegations of coerced sex, video surveillance, intimidation, and destruction of records.

The Plaintiff was the first DCF employee disciplined or discharged for having a sexual relationship with a former client.  In fact, several DCF employees who had been found to have engaged in recent sexual relationships with existing clients were not discharged for their conduct.  Dunbar was aware of this when she terminated the Plaintiff.

On July 27, 2006, the Plaintiff submitted a Grievance and Appeal Packet to the Office of Labor Relations ("OLR") challenging his dismissal as provided by Conn. Agencies Regs. § 5-201-15(b).  The OLR appointed Attorney Frederick Heisler as the hearing officer to adjudicate the Plaintiff's appeal Level 3 Grievance, a part of the state's administrative review process for terminated employees pursuant to Conn. Agencies Regs. § 5-201-15.  Heisler heard the grievance over three days - August 18, 2006, September 19, 2006, and January 12, 2007.  Heisler heard opening and closing arguments, testimony, evidentiary objections, and cross examination.  He promised the Plaintiff a fair hearing and a written ruling, and encouraged him to put on his full case.  During the hearing, the Plaintiff raised all of the due process claims he first raised to DCF's counsel in April 2006.

On January 1, 2007, Heisler issued a written memorandum of decision, which the Plaintiff characterizes as "perfunctory."  Although listing four of the Plaintiff's due process claims, Heisler ruled upon only the claim that putting the

Plaintiff to a defense of 20 year old conduct violated his due process rights.  As

to this claim, Heisler held that "[t]here is no applicable statute of limitations."

Compl. ¶ 43.  Heisler devoted only one sentence to the facts, stating:  "The

grievant was a social worker, engaging in an inappropriate relationship with an

individual under the Agency's purview."  Heisler did not refer to the applicable

policy rule that the DCF relied upon in terminating the Plaintiff, nor did he explain

why the Plaintiff was prohibited from having a relationship with someone under

the Agency's purview.  Ultimately, Heisler denied the Plaintiff's grievance,

refusing to reinstate him.

        The Plaintiff appealed Heisler's decision to the state Employee Review

Board ("ERB") established by Conn. Gen. Stat. § 5-201 and Conn. Agencies Reg.

§ 5-201-15, which is charged with hearing his final administrative appeal.  At that

time, the Plaintiff learned that Heisler intended to represent the state at his ERB

hearing and knew that he would be doing so while serving as the hearing officer

who had adjudicated the Plaintiff's Level 3 Grievance.  The Plaintiff complains

that, as a result of Heisler's conflict, the Level 3 Grievance process was a sham

proceeding in which Heisler only pretended to be a neutral hearing officer.  The

Plaintiff contends that he would not have put on his full case during the hearing if

Heisler had not misled him into believing he was neutral.  The Plaintiff asked the

ERB to disqualify Heisler on two grounds:  1) the hearing process was a sham to

aid Heisler's preparation for the ERB proceeding which did not provide Mancuso

with the process due to him under the relevant statutes and regulations; and 2)

Heisler's actions violated Rule 1.12 of the Rules of Professional Conduct, which forbids a neutral hearing officer from representing any party in connection with a matter in which he personally participated.

On April 28, 2008, the ERB declined to disqualify Heisler but suggested that the parties take the issue before the Connecticut Bar Association's ("CBA") Committee on Professional Ethics or another forum for a determination.  The ERB gave the parties 60 days to accomplish this.  Hoping to avoid a hearing that may have to be repeated later because of Heisler's participation, the Plaintiff wrote to Heisler via e-mail and regular mail on May 8, 2008 and asked him to jointly request an opinion from the CBA's Ethics Committee on the claim that he should be disqualified from the ERB proceeding.  Heisler declined, ignoring the Plaintiff's e-mail and letter and a subsequent telephone call.  The 60-day period granted by the ERB expired on June 27, 2008.

Rather than unilaterally asking for an opinion from the Ethics Committee or initiating a disciplinary hearing against Heisler, the Plaintiff chose not to proceed with the ERB hearing and filed suit in this Court on July 8, 2008.  Subsequently, on July 28, 2008, the Plaintiff moved to stay the ERB proceeding pending this Court's determination of the conflict issue involving Heisler as well as the constitutional issues raised in his Complaint.  See Pl. Mem. Opposing Judgment on the Pleadings, Ex. 3.[3]  The ERB agreed to the stay.

_____

[3]  The Court may take judicial notice of documentation from administrative proceedings without converting the current motion into a motion for summary judgment.  See, e.g., Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279,

## II.  DISCUSSION

"The standard for granting a Rule 12(c) motion is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  While Rule 8 does not require detailed factual allegations, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (internal citations omitted).

## A.  Abstention

The Defendants assert that the Court should abstain from entertaining the plaintiff's complaint under Younger v. Harris, 401 U.S. 37 (1971).  In Younger, the Supreme Court held that federal courts must abstain from enjoining ongoing

---

1282 (9th Cir. 1986) (courts may take judicial notice of records and reports from administrative proceedings without turning a motion to dismiss into a motion for summary judgment); Nickens v. N.Y. State Dept. Of Correctional Services, No. 94 CV 5425 (FB), 1996 U.S. Dist. LEXIS 22372, at *2 (E.D.N.Y. Mar. 27, 1996); Gallo v. Bd. of Regents of Univ. Of Cal., 916 F. Supp. 1005, 1007-08 (S.D. Cal. 1995).

state court criminal proceedings absent specific, narrowly defined circumstances.  Id. at 56.  In a companion case to Younger, the Supreme Court extended this abstention principle to declaratory relief.  See Samuels v. Mackell, 401 U.S. 66 (1971).  Although Younger involved a state criminal case, its holding has been applied to state civil cases and administrative proceedings as well.  See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432-35 (1982).  "Younger generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings."  Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002).  "Younger abstention is required when three conditions are met:  (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims."  Id.

However, the Second Circuit has held that "abstention and dismissal are inappropriate when damages are sought, even when a pending state proceeding raises identical issues and we would dismiss otherwise identical claims for declaratory and injunctive relief, but that a stay of the action pending resolution of the state proceeding may be appropriate."  Kirschner v. Klemons, 225 F.3d 227, 238 (2d Cir. 2000).  In the instant case, the Plaintiff asserts claims for damages under 42 U.S.C. § 1983, rendering dismissal on the basis of Younger abstention inappropriate.  Accordingly, the Court will not dismiss this case on the basis of

abstention.  The Court need not address the propriety of granting a stay because, as explained *infra*, the Plaintiff's claims are dismissed on other grounds.

### B.  Due Process

The Defendants next argue that the Court should dismiss the Plaintiff's due process claim because DCF provided the Plaintiff with a pre-deprivation notice and hearing, and an opportunity for post-deprivation review through the OLR and ERB appeals process.

In Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70 (1998), the Second Circuit articulated the appropriate legal framework under which a due process claim is analyzed:

> The analysis proceeds in two steps.  The threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution.  *If* a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process.  The second step of the analysis thus asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review.

Id. at 72 (internal citations omitted).

The Defendants do not dispute that the Plaintiff has a constitutionally protected property interest in continued employment.  Conn. Gen. Stat. § 5-240(c) provides that "classified service" employees shall not be dismissed without cause if they perform their duties in a satisfactory manner.  "It is thus recognized that classified civil service employees in Connecticut have a property right in continued employment which is protected by the due process clause of the fourteenth amendment."  King v. Lesnick, 720 F. Supp. 236, 239 n.1 (D. Conn.

1989).  Since the Plaintiff has a protected property interest in continued employment, the Court must analyze whether the Plaintiff has been deprived of that interest without the constitutional minimum due process to which he is entitled.

In <u>Cleveland Board of Educ. v. Loudermill</u>, 470 U.S. 532, 547-48 (1985), the United States Supreme Court held that due process requires that an employee with a property right in continued employment be afforded a pre-termination opportunity to respond to the charges against him coupled with a post-termination administrative procedure.  A neutral adjudicator is not a necessary component of due process at a pre-termination hearing, so long as the state affords the employee a full adversarial hearing before a neutral adjudicator following his termination.  <u>See</u> <u>Locurto v. Safir</u>, 264 F.3d 154, 174 (2d Cir. 2001).

Here, the Plaintiff was afforded a pre-termination hearing prior to his termination consistent with the Supreme Court's decision in <u>Loudermill</u>.  In addition, Connecticut law provides the Plaintiff with the right to a post-termination administrative proceeding before the OLR and ERB.  <u>See</u> Conn. Gen. Stat. §§ 5-201, 5-202; Conn. Agencies Reg. § 5-201-15.  Beyond that process prescribed in <u>Loudermill</u>, the Plaintiff also has the right to appeal the ERB's final administrative decision to Connecticut Superior Court pursuant to Conn. Gen. Stat. § 4-183.  The gravamen of the Plaintiff's claim is that his right to due process was violated because he was terminated for an offense that occurred more than twenty years ago and for which he was twice previously investigated, and

12

because he was deprived of a neutral decision-maker at the administrative review level.[4]   Specifically, the Plaintiff asserts that there is a conflict between Heisler's role as hearing officer at his OLR grievance hearing and Heisler's intended role as representative of the tate at his subsequent ERB hearing.[5]

However, the Court is unable to determine the merits of the Plaintiff's due process claim at this time because his claim is not ripe, as Heisler's role in the ERB hearing, if any, has not been determined.  The Second Circuit has recognized two forms of ripeness.  The first is "constitutional" ripeness, which is rooted in the Case or Controversy Clause of Article III of the Constitution and requires that the case involve a real or concrete dispute affecting cognizable

---

[4]  The Plaintiff also asserts that he was denied a "meaningful hearing" because, under Conn. Gen. Stat. § 4-240(c), an employee may only be discharged for misconduct, incompetence or another reason relating to the effective performance of his duties, and may not be terminated for political reasons. However, the reasons for the Plaintiff's discharge are irrelevant to his due process claim; the pertinent consideration is what process was due to the Plaintiff and whether it was provided.  See Loudermill, 470 U.S. at 541 ("The categories of substance and procedure are distinct . . . [O]nce it is determined that the Due Process Clause applies, the question remains what process is due.") (internal citations omitted); Sutton v. Hughes, No. 06CV1333(CFD), 2009 WL 2208080, at *13, *15 n.6 (D. Conn. July 22, 2009) ("In a § 1983 case such as this, the court does not determine if there was just cause for termination.  It only determines whether the [plaintiff] was deprived of a property interest without due process . . . [The plaintiff's] claims [that he was terminated based upon an erroneous interpretation of federal and state law] are irrelevant to the issue of whether he was afforded the constitutionally mandated due process to which he was entitled.").

[5]  Connecticut Rule of Professional Conduct 1.12 provides that "a lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally as a judge or other adjudicative officer or law clerk to such a person or as an arbitrator, mediator or other third-party neutral, unless all parties to the proceeding give informed consent, confirmed in writing."

concerns of the parties.  See Am. Savings Bank, FSB v. UBS Financial Services, 347 F.3d 436, 439 (2d Cir. 2003).  This form of ripeness is not implicated in this case, because there is a concrete dispute with respect to denial of the Plaintiff's due process rights.  The second is "prudential" ripeness, which is "a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it."  Id. The Second Circuit has described the prudential ripeness doctrine as follows:

> [W]hen a court declares that a case is not prudentially ripe, it means that the case will be better decided later and that the parties will not have constitutional rights undermined by the delay.  It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III.  Of course, in deciding whether "better" means later, the court must consider the likelihood that some of the parties will be made worse off on account of the delay.  But that, and its degree, is just one - albeit important - factor the court must consider. Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.

Id. at 439-40.  The test for determining whether to dismiss a claim based on prudential ripeness involves two inquiries:  "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld."  Id. at 440.

The Court finds that the Plaintiff's due process claim is ill-suited for judicial resolution at this stage and that the parties will suffer no undue hardship by the Court's withholding decision at this time.  The Plaintiff's due process claim relies

14

in substantial part on the purported conflict between Heisler's dual role as hearing officer at one stage of the administrative review process and advocate for the state at a subsequent stage of the administrative review process.  However, the Plaintiff sought and was granted a stay of the ERB hearing for the purpose of pursuing his challenge to Heisler's participation.  The ERB panel suggested that the parties seek a determination of the conflict issue by the Connecticut Bar Association's Committee on Professional Ethics, but because Heisler refused to seek guidance from the Committee, the Plaintiff chose not to seek guidance singularly and instead filed suit in this Court.  Because the Plaintiff has not gone forward with the ERB hearing, it is unclear whether or not the conflict of which the Plaintiff complains will ever come to fruition.  Thus, the Court would be in a better position to adjudicate the Plaintiff's due process claim at the conclusion of the administrative review process than it is now.  See id. ("Fitness is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur.  Issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now.") (internal citations omitted); see also Zinermon v. Burch, 494 U.S. 113, 126 (1990) (holding that a procedural due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process").

Furthermore, the parties will not endure hardship as a result of this Court's withholding of a decision on the Plaintiff's due process claim.  Hardship

"involves an evaluation of whether the challenged action creates a direct and immediate dilemma for the parties."  Id. (internal quotation marks omitted).  The Court's decision presents no hardship to the parties in this case.  The ERB proceeding is currently stayed pending determination of this action, and can be reopened following this decision.  If the Plaintiff is dissatisfied with the outcome of the ERB proceeding, the Plaintiff may appeal the ERB's ruling to Connecticut Superior Court pursuant to Conn. Gen. Stat. § 4-183.  These proceedings may well obviate any due process issues.  Should the Plaintiff still desire to pursue a constitutional due process claim at the conclusion of the state administrative proceedings, he may file a new action in federal court, at which time the Court will have the benefit of resolving all due process issues on a full factual record.  Accordingly, the Plaintiff's due process claim is dismissed without prejudice.  See Country View Estates @ Ridge LLC v. Town of Brookhaven, 452 F. Supp. 2d 142, 144 (E.D.N.Y. 2006) ("Dismissal without prejudice is . . . the proper disposition in the ripeness context.").[6]

---

[6]    This decision is further supported by Second Circuit precedent holding that a plaintiff asserting a deprivation of property rights brought under 42 U.S.C. § 1983 in the context of land use challenges must satisfy a ripeness test by showing that "(1) the state regulatory entity has rendered a final decision on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure."  Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002).  While the Second Circuit has not yet extended this ripeness requirement to the specific context of this case, at least one sister Circuit has.  See Crooks v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009) (holding that plaintiff who was terminated from his position as Deputy Sheriff was required to exhaust state remedies for his procedural due process claim to be ripe for adjudication).

Finally, the Court notes that this holding is not inconsistent with the Supreme Court's decision in <u>Patsy v. Florida Bd. of Regents</u>, 457 U.S. 496, 516 (1982), which held that exhaustion of state administrative remedies is not a prerequisite to bringing an action pursuant to 42 U.S.C. § 1983.  The Court is not dismissing the Plaintiff's due process claim because the Plaintiff failed to exhaust administrative remedies.  Rather, the Court is dismissing his claim because it is not prudentially ripe, which is a legal doctrine distinct from exhaustion.  <u>See</u> <u>Ticor Title Ins. Co. v. F.T.C.</u>, 814 F.2d 731, 735-36 (D.C. Cir. 1987) (explaining the distinctions between the exhaustion and ripeness doctrines); <u>Seafarers Int'l Union of North Am., AFL-CIO v. U.S. Coast</u>, 736 F.2d 19, 26 n.11 (2d Cir. 1984) ("Technically, 'ripeness' and 'exhaustion' are different if to some extent overlapping grounds for dismissal, ripeness focusing on the type of functions that courts should perform, exhaustion on how far a party must pursue administrative remedies before going to court.").

## C.  Equal Protection

Finally, the Defendants argue that the Plaintiff's equal protection claim must be dismissed based upon the United States Supreme Court's decision in <u>Engquist v. Oregon Dept. of Agriculture</u>, 128 S. Ct. 2146 (2008).  In <u>Engquist</u>, the Supreme Court held that the equal protection clause does not apply to a public employee asserting a violation of the clause under a "class of one" theory.  <u>Id.</u> at 2155-57.  The Supreme Court reasoned that:

17

> the class-of-one theory of equal protection - which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review - is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

Id. at 2155.

In this case, it is patently obvious that the Plaintiff relies upon a "class of one" theory in asserting his equal protection claim. The Plaintiff's equal protection claim states:

> Dunbar deprived Mancuso of equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution by construing the Department's policy on sexual relationships to justify punishing Mancuso while tolerating the same and even genuinely questionable conduct by other Department employees under the same policy.

Compl. ¶ 58. Thus, the Plaintiff is claiming that he was treated differently than similarly situated individuals at DCF.

The Plaintiff attempts to avoid dismissal of his equal protection claim by arguing that his claim differs from the claim made by the plaintiff in Engquist because it concerns the interpretation of a written policy applicable to the entire class of DCF employees and the policy's different application to him. However, this distinction is merely semantic has no significance under the reasoning of Engquist. The Supreme Court in Engquist recognized that, notwithstanding its holding, the equal protection clause "is implicated when the government makes

18

class-based decisions in the employment context, treating distinct groups of individuals categorically different." 128 S.Ct. at 2155. Here, the Plaintiff makes no claim that he was terminated from his position as a public employee because of his membership in a distinct group that was treated categorically differently than another group. Instead, he alleges that he was an individual public employee whose employment terminated without justification, and for reasons other than his violation of the relevant DCF policy. This allegation simply does not give rise to a cognizable equal protection claim under Engquist, and therefore the Plaintiff's equal protection claim must be dismissed.

### III. CONCLUSION

Based upon the above reasoning, the Defendants' motion for judgment on the pleadings is GRANTED. The Plaintiff's equal protection claim is dismissed with prejudice, while the Plaintiff's due process claim is dismissed without prejudice. The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 5, 2010.

19